Argued and submitted April 14, reversed and remanded with instructions
November 19, 1997

# In the Matter of the Marriage of

## Robert Gene LaFAVOR,
*Appellant,*
*and*

## Penny Rae LaFAVOR,
*Respondent.*

(8901-60314; CA A93539)

949 P2d 313

Brad Littlefield argued the cause and filed the brief for appellant.

John K. McIlhenny, Jr., argued the cause for respondent. With him on the brief was Sorenson-Jolink, Trubo, McIlhenny & Williams.

Before Deits, Chief Judge, and De Muniz and Haselton, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

Husband appeals from the modification order and judgment increasing his support obligation for the two minor children of the parties. We remand with instructions.

The parties' 15-year marriage was dissolved in 1989. At that time, father was earning approximately $150,000 per year as a timber broker for North Pacific Lumber Company. Mother was a teacher with an income of about $40,000 a year. Mother, who was not represented by counsel, signed a Marital Settlement Agreement that was incorporated into the judgment of dissolution. The child support provisions of the agreement were set out in three parts: (1) a monthly obligation of $250 per month for each child; (2) "Prepaid Child Support" of "approximately $800 per month" based on "a disproportionate award, transfer and distribution of property to [mother] of $230,780 and $84,070 to [father]"; and (3) "Bonus Payments" of five percent of father's gross annual bonus for each child. The parties also agreed that father's child support obligations could not be modified and that neither party would apply for any modification of the child support award unless physical custody of the children changed from wife to husband.[1]

In 1991, when mother moved to Bend, father asked her for a modification of the visitation and child support provisions of the judgment. The modification agreement signed by the parties recites that the Judgment and Marital Settlement Agreement "is hereby modified as follows." There are two sections: "1. *Visitation*" and "2. *Child Support*." The first of two subsections of the child support provisions "abate[s]" father's August support obligation, and the second subsection changes the calculation for the bonus payment and provides that, beginning in 1992, the bonus would be paid into a trust account for the children's college education. The modification stated that "[a]ll other provisions of the Marital Settlement Agreement and Judgment entered herein shall remain unchanged and shall continue in full force and effect."

---

[1] Neither party makes an argument that, because of the parties' agreement, the support provisions could not be modified.

In 1994, mother filed a motion, which she subsequently dismissed, to enforce the terms of the 1991 modification order. In 1995, father filed a motion to modify his child support obligation, leading to the order appealed here. Father alleged a change of circumstances because, in May 1995, he was terminated involuntarily from his employment at North Pacific. That termination resulted in a decrease in income from $150,000 a year to approximately $2,000 per month, which he earns at a business that he has started. Mother filed a countermotion in which she asked, *inter alia*, that father be required to pay one-half of medical and dental expenses, that the college trust fund be held jointly by father and mother and that father be required to provide a semi-annual accounting of his income for purposes of recomputation of child support.

At the hearing, father presented evidence that he had a noncompetition agreement with North Pacific for two years. Under the agreement, he was prohibited from working as a timber broker within a 200-mile radius of Portland, from soliciting or selling to North Pacific's regular customers or purchasing lumber products from any of North Pacific's regular suppliers regardless of location in the United States, and from being employed by or associated in business with any of North Pacific's regular suppliers or customers. Father testified that he requested an exemption from the noncompetition agreement, which was denied. He submitted into evidence pleadings from a Multnomah County lawsuit based on the North Pacific noncompetition agreement in which North Pacific was seeking damages against a former employee. Father testified that he had contacted a couple of attorneys to assess his legal situation and concluded that it would be too costly to fight the noncompetition agreement. He testified that he talked with a few potential employers who did not want to get involved with possible difficulties of the noncompetition agreement. He also testified that he could not relocate in order to work as a broker because of his current wife's employment in the Portland area as a salesperson for an oil company.

Father testified that he felt that starting his own business would be the best utilization of his knowledge and experience. In his business, father advises builders how to

reduce costs. He testified that the business fills a "niche" in the lumber industry and has "all of the potential in the world."

Mother offered testimony of a former employee of North Pacific who is currently a half owner and president of a lumber wholesale business. He testified that North Pacific brokers are desirable and valuable because of their training and can achieve a comparable income right away, and that it is almost impossible to enforce a noncompetition agreement in the timber broker trade because of the variety of things that a broker can do in the trade.

The trial court found that father had "experienced an unanticipated substantial change of circumstances since the entry of the last order, in that he has been fired from his employment" and that his income had decreased from an average of $12,310 each month to $2,061. However, the court found that father had "voluntarily become underemployed" since his firing because he "has the capacity or potential to continue working at $150,000 per year but he is choosing instead to open his own business[.]" The trial court held that father should pay 71 percent of the guidelines amount as child support, increasing his obligation to $1,097 a month.

Father assigns error to the increase, arguing that the court erred in several respects. He first argues that the court erred in using potential income in determining his child support obligation and in basing the obligation on speculation that he would be earning his previous income within a year. He contends that the correct formula for calculating his obligation is to determine his gross income under OAR 137-050-0350, Income from Self Employment or Operation of a Business, not OAR 137-050-0360, which provides for potential income.

OAR 137-050-0360 provides:

"(1)   If a parent is unemployed, employed on less than a full-time basis or there is no direct evidence of any income, child support shall be calculated based on a determination of potential income. For purposes of this determination, there shall be a rebuttable presumption that a parent can be gainfully employed on a full-time basis.

"(2) Determination of potential income shall be made according to one of two methods, as appropriate:

"(a) Determine employment potential and probable earnings level based on the parent's recent work history, occupational qualifications, or prevailing job opportunities and earnings levels in the community; or

"(b) Notwithstanding any other provision of this section, the amount of potential income attributed to a parent will not be less than full-time work (40 hours a week) at the current state minimum wage."

Father argues that it is undisputed that he started a new business in September 1995 for which he has been working on a full-time basis seven days a week, that the business has a positive cash flow and that he receives a net monthly income from that business. Therefore, he contends, OAR 137-050-0360 does not apply to his circumstances.

Mother argues that the court did not err. She contends that a court can consider potential income under OAR 137-050-0360(1) and that here, in the light of father's marketability and contacts, his current wife's employment, and his present lifestyle,[2] father is "unconvincing in his declaration of poverty and his inability to pursue employment as a successful trader."

■ Under OAR 137-050-0360, a court may consider potential income, and ORS 107.135, which permits modification of child support if an obligor's financial circumstances improve, does not preclude a court from forecasting a person's potential income as a basis for calculating an appropriate child support obligation. *Harper and Harper*, 122 Or App 9, 13, 856 P2d 334, *rev den* 318 Or 246 (1993). However, the necessary predicate under OAR 137-050-0360 for basing child support on potential income is that the parent is unemployed or employed less than full time. *Harper*, on which mother relies, does not hold that that predicate can be ignored.[3]

---

[2] The trial court found that father continued "to live a lifestyle of earning $150,000 annually."

[3] Mother also relies on *Hogue and Hogue*, 115 Or App 697, 839 P2d 760 (1992), *on recons* 118 Or App 89, 846 P2d 422 (1993), for the proposition that a court may consider potential income. In *Hogue*, we refused to decrease the obligor father's

In *Harper*, the obligor father argued that the court had erred in relying on his potential income in setting child support amounts. The obligor was a practicing attorney who, before his dissolution had an income of $20,000 to $25,000 a year, but, at the time of hearing, had only seven active cases and an estimated monthly income of less than $1,000. An expert witness testified that the obligor was qualified to work as an associate in a law firm for $25,000 to $30,000 a year. We noted:

> "[I]n calculating a parent's income for determination of child support, the court must base the child support calculation on potential income, if a parent is unemployed or employed less than full time. OAR 137-50-360. Nothing requires the court to find that the parent became underemployed in bad faith. In the light of husband's average annual income over the past six years and his occupational qualifications, we agree with the trial court's implicit finding that husband's present income is based on less than full-time employment[.]" 122 Or App at 13.

Mother argues that here it does not appear to be the number of hours father worked that led to the judge's decision. It is, instead, "the full employment of [father's] abilities that results in the finding of less than full-time employment." She argues that, considering father's 17-year work and earnings history and ability to avoid the noncompetition provisions of his contract, the court correctly concluded that father is working less than full time.

■ However, the premise of mother's argument—and of the trial court's conclusion—is that, because father has not pursued equal-paying employment, he necessarily is working less than full time. However, neither OAR 137-50-360 nor

child support payments after he changed employment from salesman to self-employment as a construction worker. *Hogue*, however, does not assist mother. In that case, the issue was whether the obligor had demonstrated a substantial change in economic circumstances under ORS 107.135(3)(b). We held that the father's lifestyle belied his purported inability to pay and that he failed to provide evidence to establish that his ability to pay had changed. 115 Or App at 700. Here, mother does not dispute that father has shown a substantial change in economic circumstances.

*Harper* makes the amount of replacement income the measure of full-time employment. Whether an obligor is employing his or her abilities on a full-time basis must be determined on a case-by-case basis. *See, e.g., Pagano and Pagano,* 147 Or App 357, 935 P2d 1246 (1997) (stress that drove husband to leave the practice of anesthesiology was related to the dissolution and would not prevent him from obtaining additional income from the practice of medicine); *Rykert and Rykert,* 146 Or App 537, 934 P2d 519 (1997) (wife who was in school full time rebutted presumption that she was not working full time). Here, in contrast to the obligor in *Harper,* who continued to practice law on a minimal level in a situation that the expert described as "economically nonviable," 122 Or App at 11, father works seven days a week in his new business, in which he continues to use his knowledge of the lumber industry, albeit now from the perspective of a purchaser instead of a seller. His business fills a need in the lumber industry and is showing a positive income stream.

Mother argues, however, that father is "highly marketable" and could "relocate with relative ease to another major market" where the noncompetition agreement would not be a factor. Mother is correct that the noncompetition agreement does not prevent father from seeking high-paying similar employment in another location. Although the existence of the agreement is not dispositive, the agreement also cannot be viewed in isolation. Here, the agreement limited what father could do in the Portland area, where he lives and where his current wife is employed. A person's place of residence and a spouse's employment are part of the considerations in deciding whether to relocate so as to find alternative employment after an involuntary termination. *Cf. DeNotta and DeNotta,* 147 Or App 149, 935 P2d 475 (1997) (husband did not establish a change of circumstances where he voluntarily left employment to pursue an "entrepreneurial venture" but left that venture and refused to pursue former employment, in part because he might have to relocate).

■     Here, unlike the obligor in *Harper* who appears to have been inured in a dying economic situation, father testified that, if his business did not prove viable, he would consider returning to lumber sales. On *de novo* review, we find that the evidence shows that father is employed full time at

an alternative employment opportunity in which he uses his skills from his recent work, his qualifications and education and that the new employment has a chance of growth. We conclude that father is using his abilities in full-time employment and agree with him that here the trial court erred in calculating his support by forecasting potential income.

In the light of our determination that the court erred in establishing father's support obligation of 71 percent based on potential income, we agree with father that the court erred in requiring him to pay 71 percent of the childrens' uncovered medical and dental expenses. In her counter-motion in the trial court, mother requested that father should contribute 50 percent of the uncovered amount. Although on appeal mother argues that the 71 percent award was appropriate, we conclude that an equal contribution by both parties is equitable.

█      The trial court also refused to grant father a credit in the support calculation based on the prepaid child support provisions of the 1989 agreement. The court found that father's 1991 motion to modify terminated the prepaid support provisions. Father argues that the court erred because OAR 137-050-0330 recognizes child support payments in exchange for property and that negotiated settlement agreements should be upheld. *See, e.g., Porter and Porter,* 100 Or App 401, 404, 786 P2d 740, *rev den* 310 Or 281 (1990) (courts should enforce, not disturb, negotiated settlement agreements unless there is an overriding public policy reason). He contends that the 1991 stipulated modification did not address the matter of prepaid child support and that it specifically acknowledged that "[a]ll other provisions" of the 1989 agreement remained unchanged. Therefore, he contends, there was no evidence or legal basis to conclude that the 1989 provision ended.

The 1991 agreement does not support father's argument. Two of the 18 sections of the 1989 Marital Settlement Agreement are "Visitation" and "Child Support." Each has subsections. The 1991 agreement modifies "Visitation" and "Child Support." It does not state that it modifies only specific subsections of those sections. Father's argument that the ratification paragraph leaves some subsections intact puts him

in the anomalous position of seeking a support modification while at the same time arguing that his agreement not to do so is still valid. In other words, the essence of father's argument, as the trial court correctly noted, is that he may "pick and choose" which provisions of the 1989 agreement remain valid. However, we do not agree that he may do so under the 1991 agreement, which supersedes the 1989 sections on "Visitation" and "Child Support." We agree with mother that the ratification paragraph applies to the remaining, unchanged sections of the Martial Settlement Agreement. The court did not err in not granting father a credit.

Father also argues that the trial court erred in awarding the childrens' college education trust account to mother as past due child support. Mother agrees that the parties intended that the college education fund should be placed in a trust. She asked that she be made a joint owner on the account and provided a regular accounting of the fund. On remand, the education account should be reinstated and reflect joint ownership in mother and father with regular accountings to both parties.

Mother also concedes that, on remand, the calculation of father's child support obligation should include credit for his nonjoint child. OAR 137-050-0400.

Reversed and remanded for recalculation of child support award and entry of an amended order consistent with this opinion. Costs, not including attorney fees, to father.